UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: ) | |
| ) | |
| THE RESIDENCE AT 2922 COLT DRIVE, ) | Case No. 3:22-MJ-2217 |
| KNOXVILLE, TN 37918 ) | |
| ) | |
| 2015 FORD EDGE WITH TN LICENSE PLATE ) | Case No. 3:22-MJ-2218 |
| #614BDSP AND VEHICLE IDENTIFICATION ) | |
| (VIN) #2FMTK3G89FBB39597 ) | |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, John Sharp, a Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI), being duly sworn, depose, and state the following:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a police officer and have been employed by the Knox County Sheriff's Office (KCSO) since January 2007. I graduated from the Knox County Sheriff's Regional Training Academy in 2009, and I hold a bachelor's degree in Psychology from the University of Tennessee. I have been a Tennessee P.O.S.T certified officer since 2009, and I am currently a detective with the Knox County Sheriff's Office Narcotics Unit. I attend at least 40 hours of in-service training annually in order to remain knowledgeable in the current techniques and law as it pertains to law enforcement, and I have attended over 200 hours of narcotics-specific investigative training including the investigation and prosecution of narcotics-related offenses as well as the writing, planning and execution of narcotics-related search warrants as taught by instructors from the Regional Counter-Drug Taskforce. I have completed 40 hours of training satisfactory to state law regarding the drafting, application, and execution of wiretaps. I am currently certified as an Advanced Emergency Medical Technician, I am a HazMat operations officer, and I have been

certified as a Drug Recognition Expert. I have testified as an expert witness in the fields of narcotics and drug recognition investigations in Divisions I and II of the Knox County Criminal Court. I have debriefed many cooperating defendants and Confidential Human Sources (CHSs) regarding the habits, practices, methods, and general behavior of criminal groups engaged in organized criminal activity. I have personally participated in Title III wire intercept investigations, including investigations involving large-scale drug trafficking organizations and drug traffickers. I have received specialized training in conducting drug investigations and have attended training and lectures featuring government attorneys and law enforcement officials.

2. These facts come from my observations, training, experience, and information from other agents and witnesses. This affidavit does not establish all my knowledge about this matter. Instead, this affidavit is intended to show probable cause for the requested warrant.

3. This Court is a district court of the United States and a "court of competent jurisdiction," as defined in 18 U.S.C. § 2711. This Court has jurisdiction over the investigated offense(s) and can issue the requested warrant.

4. My training and participation in investigations of drug traffickers and others involved in illegal businesses and activities have given me the knowledge to recognize the methods used by drug traffickers, drug manufacturers, and money launderers to conceal their assets, income, and activities from the government and other third parties. Based on my training and experience, I know the following:

    a. Drug dealers often place their assets derived from their criminal activities in the names of other persons or corporate entities other than their names. They use false names and identities to avoid detection of assets by law enforcement agencies and to prevent the forfeiture of the same.

    b. Drug dealers own and continue to use such assets derived from criminal activities and exercise dominion and control over this property even though the assets may be titled or recorded in the names of others.

c. Drug dealers who purchase large amounts of controlled substances must maintain and have access to large amounts of cash to support and finance their ongoing narcotics business.

d. By the very nature of drugs sales, every drug dealer is involved in a conspiracy whether the individual is a top-level source of supply or a street level drug user.

e. Drug dealers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. These records are often found on paper or stored on computers or other electronic mediums such as cellular telephones. These drug dealers commonly "front," or loan on consignment, drugs to their customers who must pay for their drugs from the proceeds of their re-sales. As a result, drug dealers must keep records of such transactions to have a quick and reliable means to recall the status of such transactions. These records will often be maintained at a residence or business used by the drug dealer or one of his accomplices.

f. Drug dealers often hide contraband, proceeds of drug sales, and records of drug transactions in secure locations, such as their residences, places that they control but are titled in others' names or homes of others who participate in or aiders and abettors of the drug conspiracy, their businesses, and bank safe deposit boxes to conceal them from law enforcement officials.

g. Drug dealers often conceal in their residences, businesses, and safe deposit boxes large amounts of currency, financial records, precious metals, jewelry, and other items of value, which are proceeds of criminal activities.

h. Drug dealers commonly use cellular telephones and Wi-Fi enabled devices to communicate with drug customers and suppliers. These communications are typically in the form of short message service (SMS), or text messages stored on phones or Wi-Fi enabled devices until deleted by the owner. In addition, cellular telephones and Wi-Fi enabled devices also keep other forms of communication such as emails, digital notes, voice recordings, voicemails, photographs, Internet search histories, GPS histories, etc., all of which are used by drug dealers to communicate with drug customers and sources of supply to facilitate their continued criminal activity.

i. Drug dealers commonly maintain addresses and telephone numbers in books, papers, computers, cellular telephones, or other electronic storage mediums, which reflect the names, addresses, and telephone numbers of their associates or customers in the drug trafficking organization.

3

j. Drug dealers often possess photographs and videos of themselves and their associates, their property, and their drugs, and these photographs and videos are kept in their possession and may be stored on computers, tablets, electronic readers, or other electronic storage mediums such as memory cards, cellular telephones, computer hard disk drives and digital cameras.

k. Drug dealers commonly have, in their possession or their residences and businesses, firearms, including handguns, pistols, revolvers, shotguns, machine guns, and other weapons, as well as ammunition for these weapons. These weapons are used to protect and secure their property, drugs, and illegal profits from thieves because drug dealers are often the victims of robberies and "rip-offs" during a drug transaction. In addition, because firearms are in demand by drug dealers, such items are often bartered for drugs.

l. Drug dealers often hide contraband or other evidence of their illegal trade in vehicles, storage units, or other locations located at or near their residences to deny ownership if such items are found by law enforcement.

m. Drug dealers often hide contraband or other evidence of their illegal trade near their residences in barns, sheds, outbuildings, or other semi-outdoor locations so that the items remain accessible to them, and a degree of deniability can be claimed if the items are found by law enforcement.

n. Drug dealers use applications like Facebook Messenger, What's App, Instagram, Snapchat, Text Now, Skype, and other similar messaging services to communicate with co-conspirators concerning the obtainment and distribution of illegal drugs. These services are accessible through cellular telephones, computers, tablets, and Wi-Fi enabled devices. Drug dealers consider these messaging services more secure than traditional telephone communications, making detection by law enforcement harder. The fact that these services can be accessed through multiple devices for the same account means that even if a drug dealer loses or disposes of a phone they fear is compromised, they can still maintain communication with their supply sources and customer base.

5. I am participating in an investigation of fentanyl and heroin drug trafficking organization (DTO). This investigation is being conducted by agents and task force officers of the FBI along with investigators from the Knox County Sheriff's Office (KCSO).

6. Unless otherwise noted herein, all of the information in this affidavit is either known to me personally, said to me by another law enforcement officer, or obtained through reading

investigative reports prepared by other law enforcement officers. This affidavit does not contain all of the information known to me or law enforcement about this investigation.

## PURPOSE OF THE AFFIDAVIT

7. This affidavit is submitted in support of a search warrant application authorizing the search warrant for the following TARGET RESIDENCE and TARGET VEHICLE:

   a. 2922 Colt Drive, Knoxville, Tennessee, (TARGET RESIDENCE), is a residence located in the Eastern District of Tennessee which is shared by Duane J. Carter, Jr. (CARTER) and Shadavia Roberts (ROBERTS). CARTER is known by law enforcement to be in a relationship with ROBERTS. During surveillance, investigators have observed both CARTER and ROBERTS enter and exit the residence freely. Court ordered electronic surveillance also indicates the TARGET RESIDENCE as the place where CARTER commonly spends the night. Investigators believe that the TARGET RESIDENCE is currently used as a location to conceal heroin and/or fentanyl, marijuana, and/or store weapons associated with and proceeds from illegal drug sales.

   b. 2015 Ford Edge with TN License Plate # 614BDSP and VEHICLE IDENTIFICATION # 2FMTK3G89FBB39597 (TARGET VEHICLE) was used by ROBERTS to transport CARTER and to conceal heroin and/or fentanyl, marijuana and/or store weapons associated with and proceeds from illegal drug sales.

8. The items to be searched are described in these paragraphs below and in Attachment A. As set forth below, there is probable cause to believe there exists evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 846, 841(a)(1), which will be found in the residence and vehicle referenced herein.

9. The facts provided in this affidavit are also based, in part, on information provided by law enforcement agents and task force officers with the FBI and other law enforcement agencies, on business records, on other information noted, and on my experience and background as a police officer. This affidavit is intended to show probable cause for the requested warrant and does not establish all my knowledge about this matter.

10. Based on my training and experience and the facts in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A), have been committed by CARTER, ROBERTS, and others yet unknown. There is also probable cause to search the locations described in Attachment A for evidence of these crimes.

11. This investigation involves the use of a Confidential Human Source (CHS).

## SUBJECTS OF THE INVESTIGATION

12. CARTER is described as a black male approximately 5' 7" tall and weighing approximately 150 pounds. He has short black hair.

13. ROBERTS is described as a black female approximately 5' 2" and weighing approximately 110 pounds. ROBERTS is believed to be the girlfriend of CARTER. I have seen ROBERTS exit and return to TARGET RESIDENCE on multiple occasions. I have also seen TARGET VEHICLE known to be utilized by ROBERTS parked at the residence during the overnight hours. In early morning of November 30, 2022, ROBERTS and CARTER were seen arriving at TARGET RESIDENCE in TARGET VEHICLE and entering the residence.

## PROBABLE CAUSE

14. Since April 2022, the FBI and/or the KCSO have been investigating CARTER and his involvement in illegal drug trafficking hereinafter known as the CARTER DTO.

15. Since April 2022, the FBI and/or KCSO have conducted at least 21 controlled purchases of heroin and/or fentanyl from CARTER or members of the CARTER DTO.

16. On September 21, 2022, officers with the KCSO executed a search warrant at 7732 Alki Lane in reference to the CARTER DTO. Investigators seized over 300 grams of suspected heroin and/or fentanyl, as well as numerous firearms. CARTER is known to carry firearms.

17. On November 16, 2022, CARTER and other members of the CARTER DTO were indicted by a federal grand jury for conspiracy to distribute four hundred (400) grams or more of fentanyl and a quantity of heroin, in violation of 21 United States Code, Sections 846, 841(a)(1), 841(b)(1)(A), and 841(b)(1)(C). Arrest warrants were issued for numerous members of the CARTER DTO.

18. On November 29, 2022, law enforcement obtained a federal search warrant for the person of Duane J. Carter, Jr. (CARTER) as he was believed to be staying at the residence of his girlfriend, ROBERTS.

19. On the morning of November 30, 2022, the FBI and KCSO executed an arrest warrant and search warrant for CARTER at TARGET RESIDENCE. When FBI announced their presence, CARTER and ROBERTS both came to the door of the residence. FBI Special Agent James Doran III detected a strong odor of marijuana coming from inside the residence. ROBERTS stated there was marijuana inside and refused consent to search. Both CARTER and ROBERTS were detained.

20. FBI conducted a safety sweep of the residence to ensure no other individuals were present and then exited to obtain a search warrant. Agents again noted a strong odor of marijuana inside the residence and observed suspected contraband pills in plain view.

21. A drug detection canine (K-9) arrived on scene and conducted a dog sniff on TARGET VEHICLE. The K-9, Knox, alerted to the passenger side door seam. Knox's handler is Officer Nicholas Halsey and has been in that position for two and a half years. Knox was recently certified on October 22, 2022, by Raymond Mackelya.

22. Based on my training, experience, and investigation, I believe that CARTER and ROBERTS, maintain a quantity of heroin, fentanyl, and marijuana and/or other evidence of illegal

drug sales at TARGET RESIDENCE or in TARGET VEHICLE. There is probable cause to believe that CARTER and ROBERTS are selling heroin and/or fentanyl, conspiring to sell heroin/fentanyl, possess marijuana, and/or storing weapons and proceeds of illegal drug sales at TARGET RESIDENCE or in TARGET VEHICLE.

## CONCLUSION

23. Based on the above, there is probable cause that the aforementioned offenses have been, and are continuing to be committed, by CARTER and members of the CARTER DTO. There is also probable cause to believe that there will be evidence of the aforementioned offenses in both TARGET RESIDENCE and TARGET VEHICLE identified and described herein.

24. I respectfully request that the Court issue the proposed search warrants.

Respectfully submitted,

John Sharp
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to before me on November 30, 2022.

JILL E. MCCOOK
UNITED STATES MAGISTRATE JUDGE